UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TONY B. JOBE | CIVIL ACTION |
| VERSUS | NO. 18-10547 |
| NATIONAL TRANSPORTATION SAFETY BOARD | SECTION "A" (3) |

**ORDER AND REASONS**

Before the Court is a **Motion for Summary Judgment (Rec. Doc. 28)** filed by the Defendant National Transportation Safety Board ("NTSB") and a **Cross Motion for Summary Judgment (Rec. Doc. 48)** filed by the Plaintiff Tony Jobe. These two motions, set for submission on October 16, 2019, are before the Court on the briefs without oral argument.

I. **BACKGROUND**

Jobe's complaint seeks relief under the Freedom of Information Act, 5 U.S.C. § 552 ("the FOIA") and the Administrative Procedure Act 5 U.S.C. § 706(1) ("the APA") and asks this Court to order the NTSB to disclose the records it withheld that relate to the fact-finding phase of its investigation of an EC130 B4 helicopter's ("the Helicopter") crash on the Island of Molokai, Hawaii, on November 10, 2011. (Rec. Doc. 48-1, p. 6, Jobe's Memorandum in Support). The crash killed the pilot, Nathan Cline, and his four passengers. *Id.* Plaintiff Jobe is an attorney who represents at least one of the families of the victims to the helicopter crash. *Id.*

The Helicopter was manufactured by Airbus Helicopters, SAS, a French manufacturing company. *Id.* Airbus Helicopters then sold the Helicopter to Nevada Helicopter Leasing, LLC, who subsequently leased it to Helicopter Consultants of Maui, d/b/a Blue

Hawaiian Helicopters ("Blue Hawaiian"). *Id.* Blue Hawaiian is a company that conducts aerial tours of the Hawaiian Islands, including Molokai. *Id.* 6-7.

During its investigation, the NTSB authorized representatives from Airbus, Blue Hawaiian, and Turbomecca (the French engine manufacturer) to participate as "parties" to its investigation. *Id.* at 7. As parties to the investigation, the NTSB allowed Airbus, Blue Hawaiian, and Turbomecca to inspect the crash site, take field notes, discuss possible accident scenarios with other team members, and perform other investigative activities. (Rec. Doc. 28-1, p. 5-6, The NTSB's Memorandum in Support). Further, pursuant to Annex 13,[1] the French Government designated accident investigators, reconstructionists, engineers, and scientists as parties to the NTSB's investigation. (Rec. Doc. 48-1, p. 7, Jobe's Memorandum in Support). However, the NTSB never appointed representatives for the victims of the crash nor did it allow the victims' families to participate in its investigation. *Id.*

After the NTSB completed its investigation, Jobe submitted a request for information under 49 C.F.R. Part 837 seeking 24 different types of documents. (Rec. Doc. 28-5, p. 17, Jobe's 837 Release Request). After reviewing this request, the NTSB informed Jobe that his request lacked an affidavit that needed to contain: the information sought, its relevance to the proceeding, and a certification stating that the material was not available from another source. (Rec. Doc. 28-1, p. 6, The NTSB's Memorandum in Support). However, despite these deficiencies, the NTSB decided to convert Jobe's Part 837 request into a FOIA request. *Id.* This decision was made in part by the fact that the NTSB had coincidently received a separate FOIA request from a different entity a few days before Jobe's Part 837 request. *Id.* This

---

[1] Under Annex 13 to the Convention on International Civil Aviation, Aircraft Accident and Incident Investigation, the States of the aircraft's operator, designer, and manufacture have the right to appoint an accredited representative to participate in the investigation, as well as technical advisors to assist the accredited representative. (Rec. Doc. 28-1, p. 3, the NTSB's Memorandum in Support).

separate request asked for "any and all records" relating to the Crash. *Id.* Thus, the NTSB applied the same "any and all records" scope to both the unnamed entity's request and to Jobe's request. *Id.* To complete these two requests, the NTSB searched through over 13,000 pages but chose to disclose only around 4,000 of these pages to Jobe.[2] *Id.* Of the 8,000 pages withheld by the NTSB, 2,349 of these pages were withheld pursuant to Exemption 5. *Id.* at 7.

In an attempt to receive more of the documents that were withheld from him, Jobe thereafter submitted a second FOIA request in 2016 that specifically asked for eleven different categories of documents that only related to the NTSB's "on-scene" phase of its investigation. *Id.* at 8. These eleven categories were as follows:

> 1) A copy of the Attendance Roster from the Organizational Meeting of the parties to the investigation;
>
> 2) A copy of the Outline of the Issues Utilized in the Organization Meeting of the parties to the investigation;
>
> 3) A copy of the On-Scene Organizational Chart, including designation of the on-site commander during the on-scene phase of the investigation;
>
> 4) A copy of all State of Party Representatives to the NTSB forms signed by any representative, technical advisor, or agent of Airbus Helicopters, S.A.S. (the manufacturer of the crash helicopter);
>
> 5) A list of all persons given badges or other authority for access to the crash site;
>
> 6) A copy of the field notes for each work group for each day of the on-site phase of the investigation;
>
> 7) A copy of all field notes approved by the Investigator-in-Charge ("IIC") for follow-up work to remove wreckage from the crash site;
>
> 8) A copy of all IIC authorizations to remove wreckage from Molokai between November 10, 2011 and January 1, 2012 including but not limited to November 11, 2011; November 12, 2011; November 13,

---

[2] Interestingly, the Court notes that the NTSB produced over 3,000 documents for the other FOIA request relating to the unnamed entity. (Rec. Doc. 28-1, p. 6, the NTSB's Memorandum in Support). However, the NTSB claims that these documents were "inadvertently" never sent to Jobe. *Id.* Because those documents are not related to the NTSB's "on-scene" investigations, the Court will not address that discrepancy. *Id.*

> 2011, November 23, 2011; November 25, 2011; and December 22, 2011;
>
> 9) A copy of Attendance Rosters for all progress meetings;
>
> 10) A copy of all of the IIC's notes for all progress meetings; and
>
> 11) A copy of all of the on-scene phase of the investigation status reports prepared by the IIC.[3]

While the scope of Jobe's first request was all encompassing and asked for "any and all records" that related to the accident, Jobe's second request only sought documents that related to the "on-scene" phase of the NTSB's investigation. (Rec. Doc. 28-3, p. 16-17, April 26, 2017 Correspondence with Jobe). Accordingly, the NTSB answered his second request by informing him that it had previously disclosed to him all the releasable documents through his first request.[4] *Id.*

Jobe was again displeased with the NTSB's response to his request, so the NTSB, in an attempt to prevent litigation, offered to re-review the 2,349 records that it previously withheld from him under Exemption 5 in his first request. (Rec. Doc. 53-1, p. 3, the NTSB's Reply). However, the NTSB also informed Jobe that it would only produce the records that were responsive to the eleven categories that Jobe listed in his second FOIA request (i.e., only the records that related to the NTSB's on-scene investigations). (Rec. Doc. 28-5, p. 38, January 31, 2018 Correspondence with Jobe) ("In several telephone calls, you and I clarified the scope of your request, and as a result, we broadened the scope of your request to include any records related to the on-scene phase of the investigation."). Ultimately, out of the 2,349 records that the NTSB re-reviewed, it ultimately only released 159 of these documents to

---

[3] (Rec. Doc. 28-1, p. 8, the NTSB's Memorandum in Support).

[4] The Court notes that the NTSB disclosed to Jobe an additional 333 of 393 documents to Jobe which originated from an outside source. (Rec. Doc. 28-3, p. 16-17, April 26, 2017 Correspondence with Jobe). However, those documents are not the subject of this case.

Jobe. (Rec. Doc. 28-5, p. 8-13, Mathew McKenzie's Declaration). The NTSB claimed that the remaining documents were either properly exempt from disclosure under Exemption 5 or were non-responsive to the 11 categories Jobe listed in his second FOIA request. *Id.*

After the NTSB completed its re-review process, Jobe subsequently filed this suit and specifically requested the following categories of documents:

> (a) All field notes from the investigation which contain relevant factual information developed by the investigators during the **on-scene phase** of the investigation;
>
> (b) All notes from **on-scene** investigation progress meetings, required to be attended by all investigation party coordinators, that address investigative issues that require coordination, changes to the investigative plan, need for additional investigative support, or an evaluation of whether urgent safety recommendations are needed; and
>
> (c) All status reports generated by the NTSB's Investigator-In-Charge during the **on-scene phase** of the investigation.[5]

Thus, through his complaint, Jobe again restricted the scope to only the documents relating from the "on-scene" phase of the NTSB's investigation. This is in stark contrast to the breadth of documents he originally asked for in his first FOIA request (*i.e.*, ""any and all records" related to the crash) and the documents he seemingly requested in his Memorandum in Support of Summary Judgment. (Rec. Doc. 56, p. 8, Jobe's Response) ("Given the NTSB's December 29, 2017 agreement relative to [Jobe's second FOIA request], Plaintiff seeks the NTSB's release of all of the 2,349 pages of records arising out of [the Crash] and withheld by the NTSB on a claim of FOIA Exemption 5."). Accordingly, based on the limited scope of this case, the NTSB filed a *Vaughn* index which only listed the 215 documents that were withheld and were responsive to the 11 categories listed in Jobe's 2016 FOIA request. (Rec. Doc. 28, p. 1-4, Index of Withheld Records).

---

[5] (Rec. Doc. 1, p. 3, Jobe's Complaint) (emphasis added).

In this motion for summary judgment, Jobe requests three specific things. First, Jobe seeks the NTSB to release all 2,349 records relating to the Crash that it withheld under Exemption 5, instead of just the 215 items it found responsive to Jobe's 2016 FOIA request. (Rec. Doc. 56-1, p. 8, Jobe's Response). Second, if the Court finds that the *Vaughn* index should be limited to only 215 documents, Jobe requests that the NTSB conduct a segregability analysis and release all 215 documents with proper redactions. *Id.* at 10. Third, Jobe seeks the NTSB to provide a more detailed *Vaughn* index that sufficiently describes the applicability of Exemption 5 to each withheld record. *Id.* at 11.

Conversely, the NTSB asks this Court to dismiss this case by granting summary judgment in its favor.

The following will discuss the merits of both side's positions.

## II. <u>STANDARD OF REVIEW</u>

The FOIA requires a federal agency, upon request, to disclose records in its possession, unless the requested documents are clearly exempt from disclosure by statute. 5 U.S.C. § 552(a)-(b); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975). The exemptions are exclusive and should be narrowly construed. *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976); *Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C.Cir.1973). Furthermore, there is a strong presumption in favor of disclosure. *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (citing *Rose*, 425 U.S. at 361). Accordingly, the government bears the burden of proving that the documents withheld fall within an enumerated exemption. *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 141 n. 2 (1989); see also 5 U.S.C. § 552(a)(4)(B) ("the burden is on the agency to sustain its action"). The agency may satisfy its burden of proof through the submission of affidavits that identify the documents at issue and explain why they fall under the claimed exemption. C*ooper Cameron Corp. v. U.S. Dep't of Labor, Occupational Safety*

& *Health Admin.*, 280 F.3d 539, 543 (5th Cir. 2002). These affidavits must be clear, specific, and reasonably detailed while describing the withheld information in a factual and nonconclusory manner. *Id.* Lastly, "FOIA cases typically are resolved on a motion for summary judgment." *Ortiz v. U.S. Dep't of Justice*, 67 F. Supp. 3d 109, 116 (D.D.C. 2014); *see Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).

### III. DISCUSSION

#### A. Scope of the *Vaughn* Index Provided by the NTSB

Although Jobe demands a *Vaughn* index of the 2,349 records that the NTSB withheld under Exemption 5, the NTSB submitted an index of only the 215 documents it deemed responsive to Jobe's 2016 FOIA request. (Rec. Doc. 28-6). The Court finds this limitation of scope to be appropriate. As the Magistrate Judge noted when ruling on Jobe's Motion to Compel the *Vaughn* index, "[a]t issue in the instant dispute is Jobe's November 1, 2016 request pursuant to the FOIA to the National Transportation Safety Board ("NTSB" or "defendant") for specific documents related to the crash investigation conducted by the agency." (Rec. Doc. 25, p. 1, Magistrate's Decision on Jobe's Motion to Compel). Accordingly, this case focuses on Jobe's second FOIA request which was limited in scope to only "on-scene" phase of the NTSB's investigation. Conversely, this suit does not concern Jobe's 2014 FOIA request which effectively asked for "any and all records" related to the Crash. Thus, the Court declines to expand the scope of the *Vaughn* index to include the 2,349 originally withheld documents.

#### B. Overview of Exemption 5 Law

Next, the FOIA requires federal agencies to disclose records upon request unless the records fall within one or more enumerated exemptions. *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001); *see* 5 U.S.C. § 552. The exemptions are

narrowly construed so as not to "'obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.'" *Klamath*, 532 U.S. at 8 (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). The relevant exemption here is Exemption 5, which allows an agency to withhold disclosure if the document meets two requirements: (1) it is an "inter-agency or intra-agency memorandum" that (2) "would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Thus, if a document is not an "agency document," an agency may not withhold it even if it reflects the agency's deliberative process. Similarly, an agency must disclose documents that would otherwise be protected under Exemption 5 if that agency waives that right by voluntarily sharing the document with third parties. *Mead Data Central, Inc. v. United States Dep't of the Air Force*, 566 F.2d 242, 253 (D.C.Cir.1977).

i. Requirement One - Inter-Agency or Intra-Agency

First, to receive protection under Exemption 5, the record in question must be an inter-agency or intra-agency document. This type of protection is normally used to cover typical communications between agency employees. However, the Fifth Circuit has extended this protection to certain communications between agency employees and outside consultants. *Hoover v. U.S. Dep't of the Interior*, 611 F.2d 1132, 1138 (5th Cir. 1980). As the D.C. Court of Appeals explained in *Public Citizen v. Department of Justice*: "records of communications between an agency and outside consultants qualify as intra-agency for [the] purposes of Exemption 5 if they have been created for the purpose of aiding the agency's deliberative process." 111 F.3d 168, 170 (D.C. Cir. 1997) (citations and internal quotation marks omitted); *see also Ryan v. DOJ*, 617 F.2d 781, 789–90 (D.C. Cir. 1981) ("When an agency record is submitted by outside consultants as part of the deliberative process, and it was solicited by the agency, we find it entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum."). Under what has come to be known as the "consultant corollary," it

is irrelevant whether the author of the document is a regular agency employee or a temporary consultant. *Public Citizen*, 111 F.3d at 170.

### ii. Requirement Two - Deliberative Process Privilege

The second requirement for receiving protection under Exemption 5 is that the document must not be normally "discoverable by a private party in the course of civil litigation with the agency." *Jordan v. Department of Justice*, 591 F.2d 753, 772 (D.C.Cir.1978). Among the privileges that fall within this classification is the deliberative process privilege. *Id*. This privilege shields from disclosure "all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be." *Arthur Andersen & Co. v. I.R.S.*, 679 F.2d 254, 257 (D.C.Cir.1982) (citation and internal quotation marks omitted). To determine whether a document is covered by this privilege, courts must look at two factors. First, courts ask whether the document is "predecisional," that is, whether the document was prepared in order to assist the decision-maker in making a decision. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C.Cir.1980). These types of documents include things like proposals, draft documents, and other subjective documents that reflect the writer's opinions rather than an agency policy. *Id.* "To ascertain whether the documents at issue are pre-decisional, the court must first be able to pinpoint an agency decision or policy to which these documents contributed." *Morley v. CIA*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir.1983)).

The second factor of the deliberative process privilege requires the court to determine if the document is "deliberative." That is, a court must decide whether the document "reflects the give-and-take of the consultative process." *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 151 (D.C. Cir. 2006) (quoting *Coastal States*, 617 F.2d at 866). Further, the document must be such that its public disclosure would not "expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency

and thereby undermine the agency's ability to perform its functions." *Dudman Commc'ns Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987). The burden is on the agency to "establish[ ] what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Coastal States*, 617 F.2d at 868. Conclusory assertions that merely parrot the language of the exemption do not suffice. *Senate of the Commonwealth of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987) (citing *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 258 (D.C. Cir. 1977) (noting that the government must show "by specific and detailed proof that disclosure would defeat, rather than further, the purposes of the FOIA.")).

### C. Applying Exemption 5 to this Case

#### i. Documents Prepared by Representatives and the Fact Witness

In this case, the Helicopter's manufacturers, Eurocopter and Turbomeca, prepared Documents 175-179 and Documents 180-206, but the NTSB claimed that Exemption 5 applied to these documents by saying, "[t]he advice provided to the NTSB by [Eurocopter and Turbomeca] are intra-agency communications covered by the consultant corollary to Exemption 5." (Rec. Doc. 28-1, p. 23, NTSB's Memorandum in Support). More specifically, "[t]he NTSB sought the outside advice, the advice was not adverse to government interests, and in providing their expertise, the consultants effectively functioned as agency employees." *Id*. Further, the NTSB attempted to refute the notion that Eurocopter and Turbomeca were "disinterested" parties by saying, "[f]irst, NTSB investigations are fact-finding proceedings that do not assign liability or adjudicate rights, with no adverse parties." *Id*. at 24. "Second, legal professionals, claimant or insurer representatives, and to the extent practicable, individuals directly involved in an accident are not permitted to be party representatives." *Id*. "Third, party participation is subject to the [Investigator in Charge's] control and direction, and to the terms

of the 'Statement of Party Representative to NTSB Investigation' to ensure that parties are serving the needs of the NTSB investigation, and not any litigation purpose." *Id.*

Here, the Court finds the NTSB's arguments unpersuasive. As participants in the NTSB's investigation, Eurocopter and Turbomeca demonstrate the epitome of "self-interested" individuals. Although these entities were there to help the NTSB's investigation, they also were undoubtedly there to collect information to prepare for inevitable future litigation. Further, the NTSB relies on *Electronic Privacy Information Center (EPIC) v. DHS*, 892 F. Supp. 2d 28, 45-46 (D.D.C. 2012) which appears to misread *Klamath* as requiring actual adversity between the consultant and the agency before the communications lose protection. However, *Klamath* does not require adversity, and the Court finds *EPIC*'s reasoning unpersuasive. *Klamath*, 532 U.S. at 12 ("The Tribes, on the contrary, necessarily communicate with the Bureau with their own, albeit entirely legitimate interests in mind. *While this fact alone distinguishes tribal communications from the consultants' examples* . . . the distinction is even sharper, in that the Tribes are self-advocates at the expense of others seeking benefits inadequate to satisfy everyone.") (emphasis added).

Instead, *Klamath* requires the agency's consultant to be disinterested and not "represent[ing] an interest of its own, or the interest of any other client, when it advises the agency that hires it." *Klamath*, 532 U.S. at 12, n.4. An agency's consultant has an obligation to be obedient "to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do." *Id.* Thus, as the United Supreme Court has noted, "the intra-agency condition excludes, at the least, communications to or from an interested party seeking a Government benefit at the expense of other applicants." *Id.*

Both Eurocopter and Turbomeca received a significant benefit here. As Jobe stated in his Memorandum in Support, "throughout the NTSB's entire investigative process, the

manufacturer and operator defendants in civil litigation were welcome to the entire government investigation file and were given editorial license to the NTSB's draft and official 'factual' reports and draft final reports of the agency's determination of the probable cause(s) of the crash." (Rec. Doc. 48-1, p. 7, Jobe's Memorandum in Support). "The accident victims and their families were not." *Id.* Thus, the Court finds that Eurocopter and Turbomeca were not "consultants" under the "consultant corollary." Accordingly, Documents 175-179 from Eurocopter and Documents 180-206 from Turbomeca are not "agency documents" and must be disclosed to Jobe. (Rec. Doc. 28-6, p. 3, The NTSB's Index of Withheld Records).

Under the same reasoning, the NTSB must also disclose the email sent by the fact witness pilot to the NTSB. *Id.* This email was not prepared by the agency nor did the NTSB hire this fact witness to serve as an agency consultant. Therefore, the Court also finds that the NTSB must release Documents 165-166 from the fact witness pilot to Jobe.

ii. Documents Prepared by NTSB and Sent Only to NTSB Staff

Next, after conducting an *in camera* inspection of Documents 62-87, 88-92, 93, 94-104, 105-119, 120-122, 167-174, and 207-215, the Court confirmed that these documents were all internally produced by NTSB personnel and were only shared with NTSB staff. Accordingly, these documents satisfy the Deliberative Process Privilege's two criteria. *Coastal States Gas Corp.*, 617 F.2d at 866. First, these documents are "predecisional" because they were drafted before the NTSB made its final conclusions on the crash. (Rec. Doc. 28-6, The NTSB's Index of Withheld Records). Second, these documents are "deliberative" because the disclosure of these documents would unjustly expose the NTSB's decision-making process. *Id.* Thus, the Court finds that the NTSB properly withheld these documents from disclosure under Exemption 5.

          iii.      Documents Prepared by NTSB and Sent to Outside Representatives

Lastly, Documents 1-61, 123-124, and 125-156 were prepared by NTSB personnel but then were distributed to other NTSB personnel and outside representatives, such as the plane's manufacturers and the plane's leasing company. (Rec. Doc. 28-6, The NTSB's Index of Withheld Records). Normally, these documents would be exempt for disclosure because they were both "predecisional" and "deliberative." *Coastal States Gas Corp.*, 617 F.2d at 866. However, for the purposes of the inter-agency requirement under Exemption 5, the Supreme Court has noted that the term "agency" means "each authority of the Government of the United States, § 551(1), and includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government . . . or any independent regulatory agency[.]" *Klamath Water Users*, 532 U.S. at 9 (internal quotations omitted). In general, this definition establishes that communications between agencies and outside parties are not protected under the deliberative process privilege. *Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Representative*, 237 F. Supp. 2d 17, 25 (D.D.C. 2002). As seen through the analysis above, entities like the plane's manufacturers and the plane's leasing company are considered outside parties because they do not constitute "disinterested" consultants under the "consultant corollary." Thus, by sharing its agency documents with non-agency entities (*i.e.*, the plane's manufacturers and the plane's leasing company), the NTSB waived the deliberative process privilege under Exemption 5. Accordingly, the Court concludes that the NTSB must disclose Documents 1-61, 123-124, and 125-156 to Jobe.

### D. Segregability Analysis

The FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after [the] deletion of the portions which are exempt." 5 U.S.C. § 552(b). Therefore, once an agency identifies a document that it believes

qualifies for a FOIA exemption, "it must undertake a segregability analysis, in which it separates the exempt from the non-exempt portions of the document, and produce[ ] the relevant non-exempt information." *Edmonds Inst. v. U.S. Dep't of the Interior*, 383 F. Supp. 2d 105, 108 (D.D.C. 2005) (citing *Vaughn*, 484 F.2d at 825). To prevail in a motion for summary judgment, the agency must demonstrate that it has satisfied its segregability analysis obligation, which it may do through its *Vaughn* index in conjunction with an agency declaration. *See e.g., Peter S. Herrick's Customs & Int'l Trade Newsletter v. U.S. Customs & Border Protection*, No. 04-377, 2005 WL 3274073, at *3 (D.D.C. Sept. 22, 2005). Under Fifth Circuit law, "[i]t is error for a district court to simply approve the withholding of an entire document without entering a finding on segregability, or the lack thereof." *Batton v. Evers*, 598 F.3d 169, 178 (5th Cir. 2010) (citing *Schiller v. NLRB*, 964 F.2d 1205, 1210 (D.C. Cir. 1992)).

Here, the Court finds that the *Vaughn* index submitted by the NTSB, combined with the NTSB's declaration that no further segregation is possible (Rec. Doc. 28-3, p. 6, Declaration by Melba Moye), demonstrates that withheld Documents 62-122, 157-164, and 207-215 are not segregable. *See Peter S. Herrick's Customs & Int'l Trade Newsletter v. U.S. Customs & Border Prot.*, No. CIV.A. 04-00377 JDB, 2005 WL 3274073, at *3 (D.D.C. Sept. 22, 2005) ("[T]he combination of a comprehensive, reasonably-detailed *Vaughn* index and an affidavit confirming that a line-by-line review of each document determined that no redacted information could be disclosed will satisfy the agency's obligation."). Further, this determination was bolstered by the Court's *in camera* review of the corresponding documents. Thus, Jobe's claim relating to segregability of the withheld documents has no merit.

### D. Adequacy of the *Vaughn* Index Descriptions

Jobe lastly requested this Court to order "the NTSB to provide a full and complete *Vaughn* index, sufficient for this Court to determine the applicability of Exemption 5 to each of the records withheld." However, the Court now finds this argument moot after it completed an *in camera* inspection of all 215 documents on the *Vaughn* index. (Rec. Doc. 28-6).

Accordingly;

**IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 28)** filed by the NTSB and the **Cross Motion for Summary Judgment (Rec. Doc. 48)** filed by Jobe are **GRANTED IN PART AND DENIED IN PART** as follows: the NTSB must release to Jobe Documents 1-61, 123-156, and 165-206 on the *Vaughn* index submitted by the NTSB. (Rec. Doc. 28-6). Jobe's request for the NTSB to produce Documents 62-122, 157-164, and 207-215 is denied.

November 18, 2019

JUDGE JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE