# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 17, 2021

Lyle W. Cayce
Clerk

---

No. 20-30033

---

TONY B. JOBE, ESQUIRE,

*Plaintiff—Appellee,*

*versus*

NATIONAL TRANSPORTATION SAFETY BOARD,

*Defendant—Appellant.*

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:18-CV-10547

---

Before CLEMENT, HO, and DUNCAN, *Circuit Judges.*

STUART KYLE DUNCAN, *Circuit Judge*:

Aircraft disasters are investigated by a federal agency called the National Transportation Safety Board (NTSB). The inquiry usually includes representatives from the aircraft's manufacturer or operator, who are uniquely positioned to shed light on what went wrong. This case, involving the tragic crash of a sightseeing helicopter in Hawaii, asks whether communications between the NTSB and such outside consultants must be disclosed to the public under the Freedom of Information Act (FOIA).

No. 20-30033

Answering that question turns on the scope of FOIA's "Exemption 5," which shields privileged "intra-agency" documents from disclosure. *See* 5 U.S.C. § 552(b)(5). Several circuits, including ours, read Exemption 5 to protect communications not only among an agency's employees, but also with some non-agency experts whose input the agency has solicited. This is known as the "consultant corollary." *See Hoover v. U.S. Dep't of the Interior*, 611 F.2d 1132, 1137–38 (5th Cir. 1980); *Wu v. Nat'l Endowment for Humans.*, 460 F.2d 1030, 1032 (5th Cir. 1972). The district court ruled the corollary did not apply to documents the NTSB exchanged during its investigation with representatives from the helicopter's operator and manufacturers. Relying on *Department of the Interior v. Klamath Water Users Protection Association*, 532 U.S. 1 (2001), the court reasoned the corollary does not protect even privileged communications with "self-interested" consultants like those.

The district court erred. *Klamath* does not stand for the broad principle that a consultant's "self-interest" always excludes it from Exemption 5. And, properly applied, the consultant corollary squarely covers the NTSB's communications with the non-agency parties here. By necessity, the NTSB solicits technical input from entities whose aircraft are under investigation. But the process only finds facts and issues safety recommendations; it does not assign liability or have adverse parties, and its conclusions are not admissible in litigation. Moreover, the agency closely supervises non-agency parties and controls the release of any non-public information. Subjecting the NTSB's communications with consultants to broad public disclosure would inhibit the agency's ability to receive candid technical input from those best positioned to give it.

We therefore conclude that the outside parties solicited by the NTSB qualify as "consultants" under Exemption 5's corollary. That does not end the case, however—deeming documents "intra-agency" is only the first step in a two-part assessment. *See Klamath,* 532 U.S. at 9 ("[T]he first condition

of Exemption 5 is no less important than the second"). Exemption 5 does not shield all intra-agency documents from disclosure, only those which are "normally privileged in the civil discovery context." *N. L. R. B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). *Cf. U.S. Dep't of Just. v. Julian*, 486 U.S. 1, 14 (1988) (Exemption 5 does not apply to documents that are "routinely available" in discovery). On remand, the district court will need to undertake the second facet of the Exemption 5 inquiry: determining whether the documents at issue are subject to a litigation privilege ordinarily available to a government agency. *See, e.g.*, *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 783 (2021) ("Exemption 5 incorporates the privileges available to Government agencies in civil litigation, such as the deliberative process privilege, attorney-client privilege, and attorney work-product privilege.").

We reverse the district court's judgment and remand for further proceedings consistent with this opinion.

## I.

### A.

In 2011, a helicopter crashed while on a sightseeing tour in Hawaii, killing the pilot and all four passengers. The helicopter was operated by a U.S. company, Blue Hawaiian Helicopters. It was manufactured by a French company, Eurocopter, and its engine was manufactured by another French company, Turbomeca.

Aircraft accidents are investigated by the NTSB, which conducts "fact-finding proceedings" to determine probable cause and issue safety

recommendations. *See* 49 C.F.R. § 831.4 (2016); 49 U.S.C. § 1131(a)(1)(A).[1] The agency does not assess "rights or liabilities," and its final report cannot be admitted in a civil action. 49 C.F.R. §§ 831.4, 835.2; 49 U.S.C. § 1154(b).[2] Investigations are supervised by an "Investigator in Charge" ("IIC"), 49 C.F.R. § 831.8, who may designate "parties" to the investigation. *Id.* § 831.11(a)(1). A party is an entity "whose employees, functions, activities, or products were involved in the accident or incident and who can provide suitable qualified technical personnel actively to assist in the investigation." *Ibid.* Parties are under the NTSB's direct supervision. *Id.* §§ 831.8(b); 831.11(a)(2). Non-agency parties must sign a "Statement of Party Representatives to NTSB Investigation," *id.* § 831.11(b), which commits them not "to prepare for litigation or pursue other self-interests." Parties may not be represented "by any person who also represents claimants or insurers," or "occup[ies] a legal position," *id.* § 831.11(a)(3), nor may they release information obtained during an investigation, subject to specific exceptions, *id.* § 831.13(b).

As part of the helicopter crash investigation, the IIC appointed party representatives from Blue Hawaiian and the Federal Aviation Administration. Under an international convention, a French agency (the "Bureau of Enquiry and Analysis for Civil Aviation Safety," or "BEA") served as an accredited representative. *See* Convention on Int'l

---

[1] All citations, unless otherwise noted, are to the 2016 edition of the Code of Federal Regulations, which was the version in effect at the time of the accident, investigation, and Plaintiff's FOIA requests.

[2] As discussed *infra*, the evidentiary bar does not apply to factual reports made at earlier stages of the investigation or the purely factual material reproduced in the final report.

CIVIL AVIATION, Dec. 7, 1944, 61 Stat. 1180, 15 U.N.T.S. 295.[3] The BEA assigned technical advisors from Eurocopter and Turbomeca to assist. The advisors were allowed to inspect the crash site, take notes, discuss accident scenarios with other team members, and perform other investigative activities. Although supervised by the BEA, the advisors were subject to the IIC's control. ICAO Annex 13, § 5.25.

**B.**

In 2014, after the NTSB finished its investigation, Tony Jobe submitted an information request under 49 C.F.R. § 837.1–4.[4] Jobe is a lawyer who represents the families of the crash victims. Although the NTSB denied Jobe's request because it lacked the required affidavit, *see id.* § 837.4(b)(2), the agency converted it into a FOIA request. The NTSB then searched 13,000 pages for any records related to the crash and disclosed about 4,000 pages to Jobe. Of the 9,000 undisclosed pages, 2,349 were

---

[3] Signatories to this convention, commonly called the "Chicago Convention," *see Wardair Canada, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 9 (1986), established the International Civil Aviation Organization ("ICAO"), which adopts uniform standards for international accident investigations. Convention, art. 37(k), 61 Stat. 1180; *see also Earl v. Boeing Co.*, --- F.Supp.3d ---, 2021 WL 274435, at *3 (E.D. Tex. Jan. 27, 2021) (recounting history of the Chicago Convention). Annex 13 provides that accredited representatives from the countries in which the aircraft was operated, designed, and manufactured can participate in the investigation and designate technical advisors to assist. ICAO Annex 13, §§ 5.18–5.20, 5.24. The advisors are supervised by the accredited representatives, § 5.24.1, and any participation is subject to the IIC's control, § 5.25. We note that at least one court has questioned whether annexes to the Chicago Convention have binding legal effect or should even be considered by federal courts. *See Earl*, --- F.Supp.3d ---, 2021 WL 274435, at *4–6. Because neither party here questions the legal import of the annexes and our conclusion does not depend on their validity, we need not weigh in on that debate.

[4] Section 837 provides a process, separate from FOIA, by which parties in litigation not involving the NTSB may request "material"—defined to include "any type of physical or documentary evidence"—that is "contained in NTSB files" or has been "acquired by . . . the NTSB in the performance of [its] official duties." *See* 49 C.F.R. §§ 837.1, 837.2.

No. 20-30033

withheld under Exemption 5, which exempts "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

In 2016, Jobe submitted a second FOIA request for eleven specific categories of documents relating to the on-scene phase of the investigation. The NTSB determined it had already disclosed all releasable documents but nonetheless offered to re-review the 2,349 withheld pages. The agency ultimately released another 159 to Jobe.

Seeking additional disclosures, Jobe filed suit in the Eastern District of Louisiana. *See* 5 U.S.C. § 552(a)(4)(B). In response, the NTSB produced a *Vaughn* index[5] describing 215 withheld documents responsive to the eleven categories in Jobe's second FOIA request. Both parties moved for summary judgment.

The district court rejected Jobe's claims that the *Vaughn* index was incomplete and that the NTSB failed to segregate releasable from nonreleasable material. The court also determined that the NTSB properly invoked Exemption 5 as to several internal documents. (Jobe does not challenge those rulings on appeal.) The court, however, ruled that documents sent among the NTSB, Blue Hawaiian, Eurocopter, and Turbomeca were not "intra-agency" and so did not qualify for withholding under Exemption 5. Specifically, the court declined to apply the "consultant corollary," which deems "intra-agency" certain communications with or materials produced by outside experts who aid in agency decision-making. *See Hoover*, 611 F.2d at 1137–38; *Wu*, 460 F.2d at 1032. The court thus

---

[5] A *Vaughn* index describes documents identified as responsive to a FOIA request but not produced and explains why they have been withheld. *See Cooper Cameron Corp. v. U.S. Dep't of Labor, Occupational Safety & Health Admin.*, 280 F.3d 539, 544 n.12 (5th Cir. 2002); *see also Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973).

granted Jobe partial summary judgment and ordered the NTSB to produce about 125 pages. The order was stayed pending the agency's appeal.

## II.

We review a summary judgment *de novo*. *Digital Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*, 965 F.3d 365, 373 (5th Cir. 2020). FOIA exemptions are "exclusive" and "narrowly construed." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citations omitted); *see also Sharyland Water Supply Corp. v. Block*, 755 F.2d 397, 398 (5th Cir. 1985) (Because "FOIA is designed to promote the disclosure of information . . . [,] exemptions from it are not to be read broadly.") (citations omitted). Disclosure is strongly favored. *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). Nonetheless, "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." *Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) (cleaned up); *see also FBI v. Abramson,* 456 U.S. 615, 630–31 (1982) ("While Congress established that the basic policy of [FOIA] is in favor of disclosure, it recognized the important interests served by the exemptions."). The government bears the burden to prove that documents fall within an exemption. *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 141 n.3 (1989); *Batton v. Evers*, 598 F.3d 169, 175 (5th Cir. 2010); *see also* 5 U.S.C. § 552(a)(4)(B) ("[T]he burden is on the agency to sustain its action.").

## III.

The district court concluded that neither the helicopter's French manufacturers (Eurocopter and Turbomeca), nor the American company leasing the helicopter at the time of the crash (Blue Hawaiian), qualified as "consultants" under the corollary because they were "self-interested." While recognizing those companies' employees were "there to help NTSB's

investigation," the court reasoned "they were also undoubtedly there to collect information to prepare for inevitable future litigation." Their participation, the court noted, also conferred a "significant benefit" on the companies: unlike the families of the crash victims, the companies had access to the "investigation file" and "editorial license" over the agency's factual reports and ultimate probable cause determination. The court relied on language from the Supreme Court's opinion in *Klamath*—namely its observation that a consultant typically "does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it." 532 U.S. at 11.

On appeal, the NTSB asserts the district court erred in refusing to apply the corollary to communications among non-agency parties to an NTSB investigation. The agency argues that its investigations are non-adversarial fact-finding proceedings and that non-agency participants are overseen by the NTSB and prohibited from disclosing non-public information absent agency approval. The agency further argues that the district court read *Klamath* too broadly and that the "parties" here are not "self-interested" within the meaning of that decision.

Whether the consultant corollary applies to non-agency participants in NTSB investigations is an issue of first impression in the federal circuit courts. Though a close question, we conclude that Blue Hawaiian, Eurocopter, and Turbomeca qualify as consultants. We therefore reverse the district court's judgment and remand for the court to determine whether the withheld documents are subject to any litigation privilege.

## A.

FOIA requires federal agencies to disclose documents within their control upon request, unless the documents fall within one of nine enumerated exceptions. *See* 5 U.S.C. § 552(b)(1)–(9). Exemption 5 protects

from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with an agency." *Id.* § 552(b)(5). The exemption thus embodies "two conditions: [a document's] source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Klamath*, 532 U.S. at 8.[6]

This case involves the first condition and, specifically, the scope of the statutory term "intra-agency." Every circuit to address this issue, including ours, has concluded that intra-agency communications are not limited to those between or among an agency's employees. *See Hoover*, 611 F.2d at 1138 (concluding that an appraisal report, although prepared by an outside expert, was "an intra-agency memorandum within the meaning of Exemption 5" (citing *Wu*, 460 F.2d at 1032)).[7] Rather, "intra-agency" also embraces "records of communications between an agency and outside consultants . . . if they have been created for the purpose of aiding the agency's deliberative process." *Pub. Citizen, Inc. v. Dep't of Just.*, 111 F.3d 168, 170 (D.C. Cir. 1997) (cleaned up); *see also Ryan v. Dep't of Just.*, 617 F.2d 781, 789 (D.C. Cir. 1980) (Exemption 5 "was created to protect the deliberative process of the government, by ensuring that persons in an advisory role would be able to express their opinions freely to agency decision-makers without fear of

---

[6] *See also Sierra Club*, 141 S. Ct. at 783 (listing various litigation privileges incorporated by Exemption 5); *Sears*, 421 U.S. at 148 ("Exemption 5 withholds from a member of the public documents which a private party could not discover in litigation with the agency.").

[7] *See also McKinley v. Bd. of Govs. of the Fed. Rsrv. Sys.*, 647 F.3d 331, 336–39 (D.C. Cir. 2011); *Hunton & Williams v. U.S. Dep't of Just.*, 590 F.3d 272, 279–80 (4th Cir. 2010); *Stewart v. U.S. Dep't of the Interior*, 554 F.3d 1236, 1244–45 (10th Cir. 2009); *Tigue v. U.S. Dep't of Just.*, 312 F.3d 70, 77–78 (2d Cir. 2002); *Gov't Land Bank v. Gen. Servs. Admin.*, 671 F.2d 663, 666 (1st Cir. 1982).

publicity.").[8] While the Supreme Court has neither embraced nor rejected this consultant corollary, three Justices (Scalia, joined by White and O'Connor) once called it a "permissible and desirable reading of the statute" because it is

> much more in accord with the purpose of the provision, to regard as an intra-agency memorandum one that has been received by an agency, to assist it in the performance of its own functions, from a person acting in a governmentally conferred capacity other than on behalf of another agency—*e.g.*, in a capacity as employee or consultant to the agency, or as employee or officer of another governmental unit (not an agency) that is authorized or required to provide advice to the agency.

*Julian*, 486 U.S. at 1, 18 n.1 (Scalia, J., dissenting).[9] This explanation tracks our circuit's rationale for adopting the corollary. *See Wu*, 460 F.2d at 1032

---

[8] No circuit has rejected the consultant corollary. *But see Lucaj v. Fed. Bureau of Investigation*, 852 F.3d 541, 548 (6th Cir. 2017) (casting doubt, in dicta, on the "textual justification" for the corollary in case addressing a related Exemption 5 doctrine). The en banc Ninth Circuit recently overturned a panel opinion that had found no textual basis for the corollary. *See Rojas v. FAA*, 989 F.3d 666 (9th Cir. 2021) (en banc) (overruling *Rojas v. FAA*, 927 F.3d 1046 (9th Cir. 2019)). Various opinions debated the corollary's textual *bona fides. Compare Rojas*, 989 F.3d at 673 (concluding "'intra-agency' in Exemption 5 does not definitively resolve the interpretive question" and therefore considering "the purposes served by Exemption 5"), *and id.* at 678–83 (Collins, J., concurring) (defending this reading of "intra-agency"), *with id.* at 685 (Wardlaw, J., concurring in part and dissenting in part) ("Exemption 5's text is crystal clear: documents or communications exchange with *outside* consultants do not fall within that exemption."), *id.* at 690–91 (Thomas, C.J., concurring in part and dissenting in part) (agreeing with Judge Wardlaw that Exemption 5 does not encompass a "consultant corollary"), *and id.* at 693 (Bumatay, J., concurring in part and dissenting in part) (arguing Exemption 5's "plain text" "leave[s] no room for documents created by those outside of an agency's employment"). Because our circuit precedent accepts the corollary, *see Wu*, 460 F.3d at 1032, we need not enter into this debate.

[9] The *Julian* majority did not address this issue "because it concluded that the documents [at issue] would be routinely discoverable in civil litigation and therefore would

("The Government may have a special need for the opinions and recommendations of temporary consultants, and those individuals should be able to give their judgments freely without fear of publicity." (quoting *Soucie v. David*, 448 F.2d 1067, 1078 n.44 (D.C. Cir. 1971))).

**B.**

In finding the consultant corollary inapplicable because of the companies' "self-interest," the district court relied principally on *Klamath*. The court read that decision too broadly, however.

*Klamath* involved documents exchanged between the Department of the Interior and Indian tribes regarding water allocation from Oregon's Klamath River Basin. 532 U.S. at 5. The Department was consulting with the tribes during a planning project and also representing one tribe in related litigation. *Ibid.* When competing water-users FOIA'd[10] these documents, the Department withheld them under Exemption 5. *Id.* at 6. The Supreme Court held the exemption inapplicable, however. *Id.* at 14–16. While noting some circuits had extended the exemption to "outside consultants," *id.* at 10, the Court observed that "in the typical cases . . . the consultant does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it." *Id.* at 11. The tribes, by contrast,

---

not be covered by Exemption 5 in any event." *Klamath*, 532 U.S. at 10 n.2 (citing *Julian*, 486 U.S. at 11–14); *see also Julian,* 486 U.S. at 18 n.1 (Scalia, J., dissenting) (explaining that the "Court does not reach the issue" of whether the communications in question qualified as "'intra-agency memorandums' within the meaning of Exemption 5").

[10] "To have 'FOIA'd' information is to have submitted a request for the information under the [Freedom of Information] Act." Spenser Hsu, *Uncovering Forensic Flaws: An Outside Perspective*, 34 GA. ST. U.L. REV. 1221, 1224 n.2 (2018); *see also* Brian G. Brooks, *Adventures in Cyber-Space: Computer Technology and the Arkansas Freedom of Information Act*, 17 U. ARK. LITTLE ROCK L.J. 417, 418 n.7 (1995) (noting FOIA "can also be a verb referring to the act of requesting access" and so "one may 'FOIA' the County Clerk, who will then state that he has been 'FOIA'd.'").

"necessarily communicate[d] with the [Department] with their own, albeit entirely legitimate, interests in mind." *Id.* at 12. Moreover, the tribes were "self-advocates at the expense of others seeking benefits"—a share of the water—"inadequate to satisfy everyone." *Ibid.* The Court found this latter point "dispositive": the tribes sought "a decision by [the Department] to support a claim . . . necessarily adverse to the interests of competitors." *Id.* at 14; *see also, e.g., McKinley v. Bd. of Govs. of the Fed. Rsrv. Sys.*, 647 F.3d 331, 337 (D.C. Cir. 2011) (identifying the tribes' "necessarily adverse" position as the "dispositive point" of *Klamath*). Thus, the tribes were not "enough like the agency's own personnel to justify calling their communications 'intra-agency'" under Exemption 5. *Klamath*, 532 U.S. at 12.

*Klamath* is distinguishable from the present case on multiple grounds. Principally, Blue Hawaiian, Eurocopter, and Turbomeca are not making "claims" that are "necessarily adverse" to those of the crash victims' families. *Id.* at 14; *see also id.* at 12 n.4 ("[T]he intra-agency condition excludes, at the least, communications to or from an interested party *seeking a Government benefit at the expense of other applicants*.") (emphasis added). Rather, their employees are participating in an investigation that is a "fact-finding proceeding[] with no adverse parties," one that is "not conducted for the purpose of determining the rights and liabilities of any person." 49 C.F.R. § 831.4. Indeed, "[n]o part of a report of the [NTSB], related to an accident or an investigation of an accident, may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report." 49 U.S.C. § 1154(b); *see also Curry v. Chevron, USA*, 779 F.2d 272, 274 (5th Cir. 1985) (expert's probable-cause testimony could not rely on NTSB report because "Congress has determined that these reports shall not be used as

evidence at trial").[11] The companies' role in the agency investigation thus stands in sharp contrast with *Klamath*, where the tribes were lobbying the agency during a planning project to obtain their desired share of a river basin's resources, in zero-sum competition with other water-users.

Furthermore, all parties to NTSB investigations—including companies like Eurocopter and Turbomeca appointed pursuant to an international convention—are under the control of the agency-appointed IIC. *See* 49 C.F.R. §§ 831.8; 831.11(a)(2); *see also* ICAO Annex 13, § 5.25. For instance, the IIC supervises a party's ability to disclose information obtained during an investigation, including within the party's own organization. *See* 49 C.F.R. § 831.13(b).[12] And a party must sign a "Statement of Party Representatives," emphasizing its role is only "to facilitate the NTSB's investigation and ultimate goal of advancing transportation safety, [and] not

---

[11] The NTSB has clarified that it "does not object to, and there is no statutory bar to, admission in litigation of *factual accident reports*," which the agency defines as "the report containing the results of the investigator's investigation of the accident." 49 C.F.R. § 835.2 (emphasis added); *cf. ibid.* (defining "board accident report" as the report "containing the [NTSB's] determinations, including the probable cause of an accident," which is expressly prohibited from being admitted as evidence). As the agency stressed at oral argument, "the final fact report that NTSB puts out, with all of its supporting documentation, photographs, data . . . becomes one hundred percent public and is admissible in court." Tr. of Oral Arg. at 39:10–39:40; *see also Curry*, 779 F.2d at 274 (distinguishing admissibility of "factual portions of the report" from "conclusory statements in the . . . reports"). This distinction (between factual material and the Board's conclusions and recommendations) might affect the second part of the Exemption 5 assessment—whether a document falls within any "privileges available to Government agencies in civil litigation." *Sierra Club*, 141 S. Ct. at 783; *see also Klamath*, 532 U.S. at 8. Because we reverse only the district court's conclusion regarding the first part of the Exemption 5 analysis, however, we do not resolve this question. The district court is free to consider the pertinence of this distinction, if any, on remand.

[12] The only exception in the 2016 regulation was for information "necessary for purposes of preventive or remedial action." *Id.* § 831.13(b).

. . . to prepare for litigation or pursue other self-interests." *Id.* § 831.11(b).[13]
The IIC may suspend or revoke party status if a party fails to follow
instructions or acts "in a manner prejudicial or disruptive to the
investigation." *Id.* § 831.11(a)(2). Contrast this degree of agency control over
non-agency parties with the situation in *Klamath*, where nothing suggested
that the Department supervised the tribes, circumscribed their role in the
planning process, or limited their ability to use information they obtained to
further their own claims.[14]

The district court also placed particular weight on the fact NTSB
investigations do not usually (and did not in this case) include representatives
of victims' families. The court's concern reflects commendable sympathy for
these families, but it is ultimately misplaced. The NTSB does not invite
victims' representatives to participate in investigations because they are
typically not experts who can "provide suitable qualified technical personnel
to actively assist." 49 C.F.R. § 831.11(a)(1); *see also* 82 Fed. Reg. 29,670,
29,681 (June 29, 2017) (explaining, in response to comments advocating
inclusion of family representatives, that "we disagree . . . that representatives
from family-member organizations . . . should be considered technical

---

[13] Reinforcing this point, the regulations specify that "party status" is reserved for
organizations "who can provide suitable qualified technical personnel actively to assist in
the investigation." *Id.* § 831.11(a)(1). A subsequent amendment to this section has clarified
that while the organization's employees or products will necessarily have been "involved
in the accident," "[t]o the extent practicable," the organization's representative "may not
be a person who had direct involvement in the accident under investigation." 49 C.F.R.
§ 831.11(a)(1) (2017).

[14] *Cf. Klamath*, 532 U.S. at 5-6 (explaining that the Indian tribes had their "own
lawyers" who "independently submitted claims on [their] own behalf" in the pending
water rights litigation, supplementing claims submitted by the United States); *see also id.* at
13–14 (describing the "function" of the documents in question as "quite apparently to
support the tribal claims" and further noting that the tribes were "pressing [their] own
view of [their] own interest in [their] communications").

experts as that term is understood in our investigations").[15] The agency's focus on technical expertise is logical given its mandate: it conducts non-adversarial, forward-looking investigations intended to "ascertain measures that would best tend to prevent similar accidents or incidents in the future." 49 C.F.R. § 831.4. In other words, the NTSB's responsibility is to probe the technical causes of aircraft accidents in order to advise regulators and lawmakers; it is not an adjudicatory entity designed to mete out justice. The exclusion of victims' family members from investigations, then, has no bearing on whether outside entities with whom the agency does communicate are "akin to . . . agency employee[s]," *Stewart*, 554 F.3d at 1245, and thus fall within the consultant corollary.

We therefore respectfully disagree with the district court that, under *Klamath*, Blue Hawaiian, Eurocopter, and Turbomeca's "self-interest" disqualifies them as consultants for purposes of Exemption 5. To be sure, *Klamath* contains language suggesting that self-interest of some kind may prevent outside experts from being deemed consultants. *See, e.g., Klamath*, 532 U.S. at 10–11 (while an outside consultant need not "be devoid of a definite point of view," it "typical[ly] . . . does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it"). Whatever that threshold might be, however, it has not been reached

---

[15] That is not to say the NTSB ignores "the needs of victims and their families for information following an accident." 82 Fed. Reg. at 29,681. To the contrary, "[t]he agency has a division whose responsibility is to ensure victims and family members are aware of factual developments in investigations, the overall status of the investigation, and other relevant information." *Ibid*; *see* National Transportation Safety Board, *Information for Families, Friends and Survivors*, https://www.ntsb.gov/tda/family/Pages/default.aspx (last visited June 16, 2021) (explaining "[t]he NTSB Transportation Disaster Assistance Division . . . provides information and assistance for family members and friends of accident victims and survivors in the immediate aftermath of an accident and in the months and years following").

here. This case, in contrast to *Klamath*, involves technical personnel who participated in an agency fact-finding investigation—a process that was designed solely to issue safety recommendations, that does not adjudicate liability, and that was controlled by the agency itself. Moreover, the non-agency participants here are the kind of experts typically accorded consultant status under Exemption 5: "outside consultants" positioned by their technical knowledge to inform an "agency's deliberative process." *Pub. Citizen*, 111 F.3d at 170.[16] Thus, given the overall context of the agency process, the companies were "enough like the [NTSB's] own personnel to justify calling their communications 'intra-agency'" under Exemption 5. *Klamath*, 532 U.S. at 12. As a result, they "should be able to give their judgments freely [to the agency] without fear of publicity." *Wu*, 460 F.2d at 1032 (citation omitted).

Of course, determining whether documents are intra-agency is only the first step in applying Exemption 5. A document must also "fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Klamath*, 532 U.S. at 8. Exemption 5 incorporates the various privileges which commonly shield government documents (most commonly, but not always, predecisional and/or deliberative in character) from disclosure during litigation. *See Fish & Wildlife Serv.*, 141 S. Ct. at 783; *see, e.g., Jud. Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 151 (D.C. Cir. 2006) (examining invocation of the deliberative process privilege in an Exemption 5 case and explaining that the

---

[16] *See also, e.g., Nat'l Inst. of Mil. Just. v. U.S. Dep't of Def.*, 512 F.3d 677, 679 (D.C. Cir. 2008) (consultant corollary shielded recommendations of "non-government lawyers" including "former high ranking government officials" and "academics" about the structure of a proposed military commission); *Hoover*, 611 F.2d at 1135, 1138 (corollary applied to appraisal by a "nongovernment appraiser with expertise in cave properties" obtained by federal agency considering acquisition of such a property).

privilege "protects agency documents that are both predecisional and deliberative"). Predecisional documents include those "'generated before the adoption of an agency policy.'" *Jud. Watch*, 449 F.3d at 151 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). Deliberative ones "'reflect[] the give-and-take of the consultative process.'" *Ibid.*

The district court suggested some of the documents at issue here would "normally . . . be exempt from disclosure." Others it did not address. Because both facets must be satisfied for the exemption to apply, the district court should address this issue on remand. Of course, as the Supreme Court very recently reiterated, the scope of Exemption 5 is not confined to the boundaries of the deliberative process privilege. *Fish & Wildlife Serv*, 141 S. Ct. at 783. The district court is free on remand to consider any potentially pertinent privilege and to assess the applicability of any such privilege under the relevant test or standard that normally governs its invocation. *See, e.g.*, *Kent Corp. v. N.L.R.B.*, 530 F.2d 612, 618, 622-24 (5th Cir. 1976) (applying prevailing standard for attorney work product privilege and finding documents shielded from disclosure by Exemption 5).

## IV.

In sum, the district court erred in concluding the documents at issue were not "intra-agency" under Exemption 5. We therefore REVERSE the court's judgment and REMAND for further proceedings consistent with this opinion.

REVERSED and REMANDED.

James C. Ho, *Circuit Judge*, dissenting:

This appeal concerns the proper interpretation of the Freedom of Information Act ("FOIA")—specifically, the scope of Exemption 5, which exempts certain "inter-agency or intra-agency" communications from public disclosure. 5 U.S.C. § 552(b)(5).

If the terms "inter-agency" and "intra-agency" exclude anything, I would think they exclude government communications with employees of the very entity the government is trying to regulate.

No court has ever applied Exemption 5 to such communications. I have found no such case. Nor has the majority or the NTSB.

And for good reason. A communication between the regulator and the regulated—between parties with conflicting public versus private interests—is the very opposite of an internal government communication. That makes it hard to square this case with the plain text of Exemption 5. I have trouble seeing how an exchange between a government agency and the employee of a company with an interest in the outcome of that agency's actions can possibly constitute an "inter-agency or intra-agency" communication.

Indeed, the Supreme Court found precisely the opposite in *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001). There the Court assumed, without deciding, that Exemption 5 would apply to a bona fide government consultant—but pointedly noted that a "consultant does not represent an interest of its own." *Id.* at 11. "Its only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do." *Id.*

Communications involving an interested party, by contrast, would not be subject to Exemption 5, according to *Klamath*. As the Court observed, "this fact alone"—that is, the fact that the purported consultant has its

"*own*, albeit entirely legitimate, interests in mind" — "distinguishes [such] communications from the consultants' examples recognized by several Courts of Appeals." *Id.* at 12 (emphasis added).[1]

That same logic readily applies here. Eurocopter and Turbomeca are private companies with a clear interest in the NTSB conducting its investigation in a manner favorable to their private corporate interests. They have an interest, for example, in steering the NTSB away from making any statements or reaching any conclusions that might support litigants who are either currently adverse to the companies, or may someday be in the future— such as the families of the crash victims represented by Jobe, the requestor here.

Tellingly, in the case cited by the NTSB as the most supportive of its position, the court concluded that the private party there had no interest separate and apart from the agency, and was therefore subject to Exemption 5. *See McKinley v. Bd. of Governors of Fed. Reserve*, 647 F.3d 331, 337 (D.C. Cir. 2011) (quoting *Klamath*, 532 U.S. at 11) ("[T]he [Federal Reserve Bank of New York] '[did] not represent an interest of its own, or the interest of any other client, when it advise[d] the [Board]' on the Bear Stearns loan."). Not surprisingly, the majority does not rely on *McKinley*.

---

[1] In a footnote, the Court acknowledged the existence of two circuit rulings that "arguably extend beyond what we have characterized as the typical examples." *Id.* at 12 n.4 (citing *Pub. Citizen, Inc. v. Dep't of Justice*, 111 F.3d 168 (D.C. Cir. 1997), and *Ryan v. Dep't of Justice*, 617 F.2d 781 (D.C. Cir. 1980). But as the Court observed, those cases involved communications with former Presidents and sitting U.S. Senators, respectively. Whatever one may think about characterizing correspondence with former executive branch officials, or with officials in a different branch of government, as "inter-agency" communications, I have no difficulty concluding that those cases present categorically different concerns from the private regulated parties in this case.

The NTSB also points out, and the majority agrees, that it is not technically a regulator—it merely investigates and reports its findings to other agencies. But as the NTSB itself acknowledges, the whole purpose of its work is to help regulators like the FAA determine how best to regulate companies to ensure public safety. No one disputes that the NTSB's findings can have a meaningful impact on the companies, and that the companies therefore have a genuine interest in the content of the agency's findings.

Finally, I do not question the sincerity of the NTSB when it says it designates certain employees of regulated companies to serve the public interest, in a kind of secondment to the agency—and not to further the private interest of their employers. I acknowledge the various steps the agency takes to insulate itself from being captured by industry interests as a result of its investigatory methods. I agree with the majority that these party representatives may be bound by all manner of regulatory strictures.

But that just proves my point: Those regulations and restrictions are necessary precisely because these employees remain on the payroll of the regulated companies and expect to return to their employers when their secondments are completed. So they obviously have an interest in the agency's work. It would be pure fiction for a government agency like the NTSB to expect these designated private employees to ignore their sense of loyalty and duty to their employers. To the contrary, that's why the agency needs regulations to try to mitigate the impact of the employees' contrary interests. But of course, those regulations don't actually eliminate those interests. Because they can't—nothing can change the fact that the employees work for interested companies. And nothing in FOIA directs courts to pretend otherwise.

What's more, as the NTSB acknowledges, company experts are seconded to the agency, not to work on safety issues *generally*, but to work on

safety incidents *specifically* involving their companies. Indeed, that's precisely why the NTSB wants their expertise—they are chosen for the very reason that they work for companies involved in the safety incidents the agency is investigating.

To be sure, the NTSB may well have a strong argument that designated experts employed by interested companies like Eurocopter and Turbomeca *should* be exempt from FOIA. The agency may be right that such an exemption would help maximize the quantity and quality of the information available to the agency about a safety incident like the tragic helicopter crash at issue in this appeal.

But that is a policy decision for Congress to make, not this court. Under the plain text of Exemption 5, I see no basis for extending the consultant corollary to the interested regulated entities who participate in an NTSB investigation. Nor am I aware of any judicial decision that would warrant such an extension here.

\* \* \*

Open government is a founding principle of our country. As James Madison, the father of our Constitution, once wrote, "a people who mean to be their own Governors, must arm themselves with the power which knowledge gives." Letter from James Madison to W.T. Barry (Aug. 4, 1822), *in* THE JAMES MADISON PAPERS AT THE LIBRARY OF CONGRESS, 1723–1859: Series 1, General Correspondence.[2]

It was this spirit that gave rise to the adoption of FOIA on July 4, 1966. *See* Pub. L. No. 89-487, 80 Stat. 250 (1966). FOIA offers every American

---

[2] This letter has been made available online by the Library of Congress. *See* http://hdl.loc.gov/loc.mss/mjm.20_0155_0159.

one simple promise: the right to know what your government is doing. "[A]s Justice Brandeis said, sunlight is the best disinfectant." 162 CONG. REC. S1495 (daily ed. Mar. 15, 2016) (statement of Sen. Cornyn during debate over 2016 amendments to FOIA).

Accordingly, the Supreme Court has repeatedly held that exemptions under FOIA are exclusive and must be narrowly construed. *See, e.g.*, *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976); *Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C. Cir. 1973). "Consistent with the Act's goal of broad disclosure, these exemptions have been consistently given a narrow compass." *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989). *See also FBI v. Abramson*, 456 U.S. 615, 630 (1982) ("FOIA exemptions are to be narrowly construed.").

Applying this established principle of interpretation to the plain meaning of "intra-agency" communications, I would hold that government communications with the employees of regulated parties fall squarely outside of Exemption 5, and therefore subject to the disclosure mandates of FOIA. I agree with the district court that Exemption 5 does not apply to the documents at issue in this appeal and would therefore affirm. The majority disagrees. Accordingly, I very respectfully dissent.